No. 22.—Moses Eastman and Samuel Philbrick, plaintiffs in error *vs.* Henry McAlpin, defendant in error.

The answer of a defendant is evidence for him, so far as it is responsive to the case made by the bill, or connected necessarily with the responsive matter, or *explanatory* of it. As where it is charged in the bill that the defendant in execution is *in possession* of the property conveyed by him to his co-defendant in the bill, as being *prima facie* evidence of fraud—the answer admitting the possession, and showing, by way of explanation, that the defendant in execution holds as tenant of the vendee, paying him rent and hire therefor, is responsive to the bill, and therefore evidence in his favor.

In the construction of a statute, when the words of the enacting clause are clear and positive, recourse must not be had to the title or the preamble. They serve to assist in removing ambiguities, where the intent is not plain and manifest. The title of an act and the preamble, are, strictly speaking, no parts of it.

A *bona fide and absolute conveyance* of any part, or the whole of his estate, by a person unable to pay his debts, (even to a creditor in satisfaction of a pre-existing debt, whereby another creditor is excluded from any share or portion of the estate so conveyed,) if the same be free from any trust for the benefit of the seller, or any person appointed by him, is a valid conveyance as against such excluded creditor, and all other persons. Such a conveyance is not obnoxious to the statute of 1818. (a)

This was a Bill in Equity, filed to set aside a conveyance of an insolvent debtor, under the act of 1818, and was tried before Judge Fleming, in Chatham Superior Court, January Term, 1846. The following are the facts of the case: Henry McAlpin, the defendant in error, under a contract for that purpose, furnished bricks to Samuel Philbrick, one of the plaintiffs in error, for the building of a dwelling-house and outbuildings on two lots in Brown Ward, city of Savannah. The bill for the bricks was partially paid, when Philbrick suspended payment, generally. After his suspension, he paid about six hundred dollars on the account for bricks, leaving a balance then due of some two thousand dollars, or up-

---

(a) "An Act to prevent assignments, or transfers of property, to a portion of creditors, to the exclusion and injury of the other creditors, of persons who fail in trade, or who are indebted at the time of such assignment or transfer." Assented to Dec. 19, 1818.

"Whereas a practice of selecting particular creditors by assignments and transfers of property, made by persons indebted, and thereby excluding or defrauding other *bona fide* creditors of their just claims, on the estate of insolvent debtors, is contrary to the first principles of equity and justice; to prevent the mischief thereof,

"Be it enacted, &c., That any person or persons, unable to pay his, her, or their debts, who shall at any time hereafter make any assignment or transfer of real or personal property, stock in trade, debts, dues, or demands, in trust, to any person or persons, in satisfaction or payment of any debt or demand, or in part thereof, for the use and benefit of his, her, or their creditor or creditors, or for the use and benefit of any other person or persons, by which any creditor of the said debtor shall or may be excluded from an equal share or portion of the estate so assigned or transferred, such assignment, transfer, deed, or conveyance, shall be null and void, and considered in law and equity as fraudulent against creditors :—Provided, nevertheless, that nothing contained in this act, shall prevent any persons in debt, from *bona fide* and absolutely selling and disposing of any part, or the whole of his, her, or their estate, so the same be free from any trust for the benefit of the seller, or any person or persons appointed by him, her, or them."

wards. McAlpin brought his action for the balance against Philbrick, and recovered a judgment. Previously to the recovery of this judgment, Philbrick being indebted to the minor children of J. Stone, deceased, of whom Eastman, the other plaintiff in error, was guardian, on a note endorsed by J. W. Morrell, of Savannah, and being also indebted to the estate of Wesley Abbott, who had been for many years a workman in the jewelry store of Eastman, and in the welfare of whose family Eastman felt an interest, was pressed by Eastman for a settlement of those debts. Under the pressure, as the only means of meeting the demands, Philbrick resolved to sell the said property in Brown Ward, a house and lot in Hicks Tything, Savannah, three slaves, his house servants, and his furniture, and to remove his family to the North to reside, until he was relieved from his difficulties.

He, accordingly, proposed to Eastman to become the purchaser of the whole property, in which event, after paying certain mortgages upon the property in Brown Ward and Hicks Tything, he would allow as much of the purchase-money as was necessary to satisfy the aforesaid debts to Stone's children and Abbott's estate to be so *applied*. The purchase was made, at an adequate price. Eastman assumed the payment of the mortgages, which he took up, and advanced the balance of the purchase-money in cash, and took up and delivered to Philbrick the notes of J. Stone's children and Abbott's estate, and paid him the surplus in cash.

Eastman subsequently sold the Hicks Tything property, at an advance of $500 on the original purchase by him. He went on to complete the building in Brown Ward, which, at the time of the sale, was in an unfinished condition; and after expending upon it about $3,000, had some of the rooms sufficiently finished to be occupied.

The sale took place in April, and in July following Philbrick stopped payment. *The conveyances were absolute, and the purchase-money proved to have been paid.* The bill alleged that Philbrick remained in the possession of the slaves and furniture after the sale, and exercised ownership over them and it, and subsequently, and as soon as the said dwelling-house and appurtenances in Brown Ward were completed, proceeded to occupy the same, and still continued to do so. The possession being so alleged, the questions were asked in the interrogatory part of the bill, " In whose possession the said estate, real and personal, then was ?" and, " What had become of said slaves and furniture ?" To which the said Eastman answered, admitting the possession of Philbrick, and stated, by way of explanation thereof, that Philbrick, having changed his mind as to sending his family to the North to live, hired the furniture and two of the slaves, he (Eastman) having sold the other; and in December of the same year he rented the house in Brown Ward, at $300 per annum, for one year, which renting and hiring to Philbrick had been continued. The answers of both the said Eastman and Philbrick, positively denied all *trust* of any kind, and averred that the said sale was absolute and *bona fide*. And no *trust* was proved.

The cause proceeded to trial in the court below; and the evidence having closed, the Circuit Judge charged the jury that possession of the vendor, after the sale, was *prima facie* evidence of fraud, and, unless explained, became conclusive; and that the explanation of that possession contained in the answers was no evidence, because not responsive to the allegations

or interrogatories in the bill.    Whereupon the solicitors for the plaintiffs in error, who were the defendants in the bill, excepted to the said charge, because the answers in that regard were directly responsive, both to the allegations and interrogatories in the bill ; and because the transaction being an absolute sale for a valuable consideration, as proved by the evidence in the case, the purchaser had a right to do with the property as he pleased; to place whomsoever he would in possession ; and that, under those circumstances, no inference of fraud or trust ought to have been left to the jury, as deducible from the vendor's possession, in this case.

And the court below further instructed the jury that the terms *bona fide* in the said act of 1818 didn ot only mean an absolute sale for a valuable cash consideration paid at the time, but superadded the idea, that any condition or agreement in the original contract of sale from an insolvent man that the purchase-money should be applied to the payment of certain creditors, whereby others became excluded, the money having in fact been so applied, would not be *bona fide* within the meaning of the act of 1818. To which the solicitors for the plaintiffs in error excepted.

The solicitors for the plaintiffs in error then requested the court to instruct the jury that the deed being absolute, if there was no evidence of a secret trust, the case was not within the statute of 1818, which instruction the court refused to give ; but, on the contrary, charged the jury that the deed, although absolute, and for a cash consideration paid at the time, was within the statute, if the property was purchased under a condition and agreement entering into the original contract of sale between Philbrick and Eastman that the purchase-money should be applied to the payment of certain creditors whereby others became excluded, Philbrick being insolvent at the time.    Also, that if the consideration-money, or any part thereof, was applied under such contract to the payment of a pre-existing debt, the case was within the statute.    To which the plaintiffs' solicitor excepted.

The solicitors for the plaintiffs in error asked the court, further, to instruct the jury that the plaintiff in error, Eastman, having purchased for a cash consideration, paid by him at the time, the consent of Philbrick that the cash purchase-money should be applied to the payment of the debts of Philbrick to the minor children of J. Stone, of whom Eastman was the guardian, and to Abbott's estate, and the actual application of the purchase-money to those objects, did not bring the case within the act of 1818 : which instructions the court refused to give ; but, on the contrary, charged that the condition and agreement in the original contract of sale between Philbrick and Eastman that the purchase-money should be applied to the payment of the said debts, Philbrick being insolvent, created a trust for the payment of said creditors of Philbrick, to the exclusion of other creditors, which brought the case within the act of 1818.    To which the plaintiffs' solicitors excepted.

The solicitors for the plaintiffs in error then asked the court below to instruct the jury that whilst it might be true that if Philbrick had assigned the property to Eastman to pay the debts out of what the same might realize, it might have been within the act, yet that Eastman having made an absolute purchase, for cash advanced, the direction of Philbrick to apply that cash, when paid, in a particular way, even to the payment of particular debts, did not bring the case within the act of 1818 : which instruction

the court refused to give ; but, on the contrary, charged the jury that the instruction asked was substantially answered in the charge given on the previous instructions prayed.	Whereupon the solicitors for the plaintiffs in error excepted.

The jury, under the charge and decision of the presiding judge, rendered a verdict setting aside said conveyances, and decreeing the said property to be subject to the debts of Philbrick, &c.

Upon all which exceptions to the decisions of the court below the plaintiffs assigned error.

Wm. Law for the plaintiffs in error.

·The plaintiffs in error will maintain, that the court erred in charging the jury, that the explanation in the answers as to the possession by Philbrick after the sale, was not responsive to the bill and not evidence in the cause.

They contend that such passages of an answer as are explanatory of other passages responsive to the bill must be read.—5 *Ham. Rep.* 284, 285 ; 1 *Russ. and Mylne,* 64 ; 5 *Sim.* 225 ; 3 *Russ.* 149 ; 3 *Phillips on Ev. by Cow. Notes,* 927.

Affirmative facts in the answer responsive to the bill, either to the charging, stating, or interrogatory part, are conclusive as testimony, unless repelled by proof.—2 *John. Ch. Rep.* 85 ; 1 *Cowen's Rep.* 744, *by Woodworth, J.* 711, 742 ; 1 *Paige* 239 ; 3 *Wend.* 643 ; 5 *John. Ch. Rep.* 534, 542, 543 ; 2 *McCord's Ch. Rep.* 90, 101, 102, 344, 350 ; *Cooper's Ch. Cas.* 161 ; 4 *Paige,* 368.

2d. They maintain further, that the court erred, because possession in the vendor, after sale, is no evidence of fraud in the sale of real estate, to the same extent as in the case of personal property.—*Newland on Con.* 371 *et Seq.* ; *Roberts on Fraud, Con.* 549, 550.

3d. They maintain also, that the court erred, because an adequate cash consideration having been proved to have been paid, and the transaction a *bona fide* sale, possession was no evidence of fraud. The *bona fide* purchaser, who had paid his money, had taken absolute conveyance, could place whom he pleased in possession, without invalidating his title.

4th. They will maintain, that in a case, in which a full, fair and adequate consideration was paid in cash, or its equivalent, the conveyance absolute on its face, and no secret trust proved, the sale is *bona fide* within the meaning of those terms in the act of 1818, notwithstanding the purchase-money, was applied to the payment of antecedent debts, under an agreement, as the condition of the purchase, that it should be so applied ; because the statute embraces only tangible property, and not money. Under the statute, an insolvent may pay his debts with his money ; and such money cannot be followed.—*See Ch. Harper's Decision in Schultz's case—pamph. p.* 45.

A valuable consideration implies the *bona fides* of the transaction, unless it is shown to be merely colorable.—*New. on Con.* 381 ; 5 *Tm. Rep.* 238 ; 4 *East.* 1.

As the whole case turns upon the act of 1818, the construction of that act becomes the prominent inquiry of the cause.

The plaintiffs in error maintain, that the existing evils intended to be remedied by the act, ought to be carefully weighed in its construction.	The old law, and the construction of the statutes *in pari materia* are to be considered.—3 *Dall.* 233, 253, 267 ; 4 *East.* 438 ; 1 *Kent's Com.* 460, *et seq.*

The evil to be remedied was the practice, by insolvents, on the eve of winding up, of making assignments in trust, giving a preference and securing an advantage to the debtor.

1st. At common law an insolvent might prefer any creditor ; he might make an assignment, to secure an antecedent debt, of a part or the whole of his property ; so there was no fraud or color, and he might do this the very night he absconded.—11 *Wheat.* 98 ; 7 *Peters,* 614.

2d. He might do the same thing under 13 Eliz : if there was no fraud proved. Because *bona fide* and upon *good consideration.*	That was all the statute required.— *New. on Con.* 381, 382.

3d. Under the bankrupt acts, he might secure a particular creditor, unless by deed, or in contemplation of bankruptcy, or it was of *all* his effects.	In either of these cases the law made it an act of bankruptcy.—*New.* 381, 2 ; *Doug.* 92 ; 7 *Peters,* 614.

Aided by the light derived from this inquiry, we proceed to consider the construction of our own act; what is prohibited by the enacting clause of the act of 1818? An assignment *in trust* giving a preference. What is saved by the proviso? An absolute conveyance. May an absolute conveyance be embraced? Yes, when it is not *bona fide;* when it is merely colorable; when the facts and circumstances show a secret trust. Is the payment of an antecedent debt such a consideration as will constitute the transaction *bona fide?*

Yes, if it is absolute, and nothing reserved to the vendor, and free from any trust. The reason is, because the statute is silent on that subject. It does not prescribe whether the consideration shall be a present advance, or the payment of a debt. It contents itself with the exclusion of all trust.

The plaintiffs in error will maintain that in the absence of evidence of a secret trust, this transaction is *bona fide* within the statute; and that as the sale was not voluntary on the part of Philbrick, was not made with the view to defeat creditors, nor in the immediate contemplation of insolvency; but was extorted and wrung from him by the pressure of Eastman, the case is not within the statute.—*Doug.* 88, 92; 1 *Wash. Cir. Ct. Rep.* 34, 35; 1 *Amer. Jur.* 9, 197.

They further maintain that as no trust attached upon the property sold, nor was the consideration an antecedent debt, the purchaser having paid his money, the application of the money in part to the payment of pre-existing debts cannot create a *trust* within the meaning of the act. As the vendor could apply the money, when paid to him, without restraint by the statute, it could not violate the statute that the purchaser should stipulate as the condition of his purchase, for such a disposition of the money, as it was lawful for the vendor to make, had the money been placed in his hands.

The plaintiffs in error will also maintain that the decree is unjust and inequitable upon the grounds specified in the last exception.

R. M. CHARLTON, for defendant in error, in reply to the opening argument of counsel for the plaintiffs in error.

*1st Exception.*—This exception is based upon the charge of the court, that possession of the vendor after the sale, was *prima facie* evidence of fraud, and unless explained became conclusive; and that the explanation of that possession stated in the answers was not evidence, because not responsive to the allegations of the bill.

The court below was right on both these points, as we will proceed to show.

The doctrine, that the possession of the vendor after the sale, is evidence of fraud, unless such possession be consistent with the deed, is now so well established, that it admits of no doubt. The only difficulty on the point is, is it conclusive, or is it only *prima facie* evidence of fraud?—See *Twyne's case,* 3 *Coke,* 80; also reported in 43 *Law Library,* p. 1, and cases cited in the *English and American notes.*

Many of the cases hold the presumption to be incapable of being rebutted by any proof, and hold it to be conclusive, especially when the consideration, or a part of it, was an antecedent debt, as we will show this to be.—*Smith* vs. *Henry,* 1 *Hills, S. C. Rep.* 16; *Edwards* vs. *Harben,* 2 *Term. Rep.* 587; and also cases cited in *English notes to Twyne's case,* 43 *Law Library,* p. 36.

In *Virginia,* such possession is, *per se,* fraudulent, however free in other respects the case may be from any evidence of dishonesty or unfairness.—See 43 *Law Library,* p. 43.

And so far is the principle there carried, that an immediate *re-hiring, bona fide,* renders the sale fraudulent in law, as was held in *Lewis* vs. *Adams et al.,* 6 *Leigh,* 320; see p. 45 of 43 *Law Library.* (And this proceeds upon the principle, that this subterfuge of re-hiring would be so often resorted to, that if allowed to prevail, it would defeat the whole object of the law.)

And the *Kentucky* authorities are to the same strong purport. The possession is *conclusive* evidence of fraud, not merely *prima facie.* A re-delivery on loan, or for hire, does not help it.—See 43 *Law Library,* p. 46; see, particularly, *Laughlin* vs. *Ferguson et al.,* 6 *Dana,* 111.

In *Illinois*, the possession inconsistent with the deed, is a fraud in law.—43 *Law Lib.* 47.

So in *Indiana*, no *evidence* can be admitted to explain a possession, which is inconsistent with the contract.—43 *Law Library*, 47.

And in *New Hampshire*, though the distinctions taken are somewhat refined, it has been decided, that an agreement subsequent to the sale, that the vendor should retain possession and pay rent, was no sufficient explanation of possession, for it did not disprove (indeed, under circumstances like the present, it may be said to prove) a secret trust.—*Coburn* vs. *Pickering*, 3 *New Hampshire*, 415.

In *Pennsylvania*, the rule is carried to its utmost extent.—*Clow and another* vs. *Woods*, 5 *Sergeant & Rawle*, 275 ; 43 *Law Library*, 52.

And the vendee's possession must continue ; it must not go back to the vendor. —43 *Law Library*, 53.

In *Vermont*, the principle is carried to the extent, that " no matter how honest the conveyance may be in point of fact, the law pronounces'it fraudulent *per se*, and void."—43 *Law Library*, p. 55. And the possession of vendee must be continuing ; it must not go back to vendor.

And though, in *Alabama*, the subject is involved in perplexity, and the decisions are contradictory ; yet even *there*, though the consideration were ample, and *bona fide* paid, and the bill of sale recorded, and notice given to the world, these would not be sufficient explanations of the possession.—And see *Hamilton* vs. *Russel*, 1 *Cranch*, 309, 316, 318.

All the cases proceed upon the presumption, that there was a trust, express or tacit, for the use of the vendor, evidenced by the continued possession.—*Smith* vs. *Henry*, 1 *Hill's S. C. Rep.* 16 ; 43 *Law Library*, pp. 30, 44.

The fact that a price was paid for the property by the vendee, does not vary the principle, except in degree it changes the presumption, according to the Carolina doctrine, and some other cases, from *conclusive* to *prima facie* evidence of fraud ; but the presumption remains there, and will continue to remain, until rebutted by actual proof.

The court below committed no error on this point. It leaned as strongly to the plaintiffs *in error* as it could, in charging the jury, that the continued possession was only *prima facie* evidence of fraud. And though the principle is oftener invoked in reference to personal property, yet there is no reason in law why it should be so limited. The statute of 13 *Elizabeth, c. 5,* upon which all these cases proceed, speaks as well of " fraudulent feoffments," &c., " as well of lands and tenements as of goods and chattels," and declares them to be void. There is not the slightest distinction between lands and goods in this regard, and not the slightest reason why there should be, especially in the State of Georgia, which has by its legislation virtually broken down many of the English distinctions between the two.—*Schley's Dig.* p. 214–15, sec. 1 and 2. And the decisions on this point expressly embrace *lands.*—*Hildreth* vs. *Sands*, 2 *John. C. Rep.* 46 ; *Bates* vs. *Graves*, 2 *Ves. Jr.* 293.

But it is said—and *that* forms another branch of this exception—that the answers of the defendants below furnished sufficient evidence to rebut this *prima facie* presumption, and that the Judge repudiated the *evidence*, (as it is called,) because he said that it was not responsive to the allegations or interrogatories of this bill.

There can be no doubt, we apprehend, that no part of an answer is admissible for the person making it, except when it responds to the bill. What he says in avoidance, he must prove, or it goes for nothing.—*Hart* vs. *Ten Eyck*, 2 *John. C. Rep.* 88, *et seq.*

An examination of the bill and answers will show that the defendants were not interrogated except as to the fact of possession (which they would not have dared to deny ); but as to the agreement under which the vendor so retained *possession* no question is asked. See the bill.

(The defendants are asked to state the agreement concerning the purchases ; but they are not asked to state the agreement as to the retention of the possession, but only as to the fact of possession.)

And besides, we have already seen that the great weight of authority is against the opinion that the fact of a re-hiring relieves the case from the legal inference of fraud, even though it be *bona fide.* Indeed, it is we that ought to complain upon this point. The court, upon very respectable authority, might have told the jury that the possession of the vendor was conclusive evidence, legal evidence of fraud; admitting of no explanation, either by the answers of defendants, though responsive to the allegations and inquiries of the bill, or by any other testimony. And the jury would have been authorized, under the facts of the case as set forth in the answers of the defendants below, to have come to the conclusion that even if the possession of vendor was only *prima facie* evidence of fraud, that, despite the answers, it was not rebutted.

Looking to the inadequacy of compensation of the land—the value of three negroes—the fact that Philbrick, the alleged vendor, remained under the shelter of the same roof, eat off the same table, and was waited on by the same servants—the meagre sum that he paid his alleged vendee for the rent of a building that cost him $8,000—the inadequate hire of the negroes—the fact that Philbrick allowed him all the benefit of the cheap purchase of the lot in railroad bonds—and this additional fact that it is admitted in the answers that all this benefit to Philbrick was by compact and agreement—all goes to show that Philbrick, in making this sale to Eastman, did gain a positive benefit, the benefit of keeping the same house at a very cheap rate, and of retaining at a very moderate hire, the same negroes and the same furniture, and that these were benefits that would not have been obtained by him, if a sale had been made to any other; and when we remember that this was confessedly the last plank of Philbrick's property, and that Eastman was saving it for himself and his friends, at the expense of all the other creditors of Philbrick, we must be blind if we do not see that if it was not expressly agreed, it was at least *tacitly* implied, that such indulgence and benefit would be granted to him.—See *Smith* vs. *Henry*, 1 *Hill's S. C. Rep.* 23.

The 2d, 3d, 4th and 5th exceptions bring us to the consideration of what is called for brevity the " Act of 1818," and which is found in *Prin. Dig.*, p. 164.

Let us read that act carefully, and analyze it ;—

And first, let us ask for what purpose this act was passed—what was the old law—what the mischief it allowed—and what was the remedy ? I believe that this is a cardinal rule in the construction of all remedial statutes.—1 *Black. Com. top page*, 59.

1st. What was the old law—how stood the common law at the making of this act ? It allowed preferences to be given by an insolvent man to any creditor he pleased, in total exclusion of other creditors, however meritorious.

2d. What was the mischief ? It was, that a man, who had become insolvent and reckless, selected out as his beneficiaries his relations and his friends, by an arbitrary proceeding, withholding frequently, at his own pleasure, from the poor and honest laborer, his slender pittance, which he had earned fairly, and which he was richly entitled to, but which was refused to him by his debtor, because such debtor chose, with the sanction of the law, to pay others whom he'liked better, but who were not a bit more meritorious. But the injustice of such a proceeding frequently struck courts of justice, especially courts of equity, whose golden rule is, that " equity is equality," and though the courts could not legislate, yet, as we have seen in the case of Smith and Henry, and as we will see in the case of *Goodrich* vs. *Downs*, in 6 *Hill's Rep.*, 439, 440, they strove to confine the unjust rule.

3d. And what was the remedy provided ? The good sense of the Georgia Legislature, recognizing the rule that equality is equity, and that a man who was unable to pay his debts, held his remaining property virtually as a trustee for his creditors, proceeded to declare that this practice of selecting particular creditors was contrary to the first principles of equity and justice, and passed the act of 1818 to prevent such selection in future in the State of Georgia.

Now the first idea that we have to combat is, that *absolute* deeds, containing no trust upon their face, are not within the spirit or intent or letter of this law.

We must remember, before we take up this objection, that " it is the business of judges so to construe this act, as to suppress the mischief and advance the remedy."—1 *Blackstone's Com.* 59.

The argument used by our adversary, if we correctly understand it, is, that the *deed* must be " in trust ;" that is, it must appear upon its face that there is a trust.

But what do the words " in trust" mean ? They mean that if the property is conveyed to a person *for the benefit* of particular creditors ; or, if the *effect* of the deed or transfer is to prevent an equal distribution of all the effects among the creditors of the insolvent, and to secure it to a few, that *that* is the trust for the benefit of the particular creditors, and therefore the deed is void.

Surely the. legislators were not so stupid, and the law is not so impotent, that while they and it condemn the selection of particular creditors in the most unmeasured terms, while they and it declare it to be contrary to the " first principles of equity and justice ;" and while the act was passed expressly " to prevent the mischief thereof," yet, if a party wishes to avoid the law, and to do the very thing it condemns, all that he has to do is to leave out the words " in trust" to make an absolute deed, and have the trust secret or apart from the deed, and he and his favored crew may smile at the law in triumph.

It would be curious enough if this could be so, but it is not so ; and the decisions both of Georgia and South Carolina on this very statute, expressly repudiate such an idea ; and they hold the clear and correct doctrine, that if the agreement dehors the deed, or the *effect* of the deed, whatever its words may be, gives one creditor the preference over another of an insolvent man, the deed is void under the provisions of this act of 1818.—*Cumming* vs. *Fryer, Dudley's Geo. Rep.* 182 ; *Railroad Co.* vs. *Claghorn et al., Speers' Equity Reports,* 552, *especially* 553 ; *Bank of Georgia* vs. *Schultz, ibid.* 556 ; *Chancellor Kent's MS. Opinion.*

And it is impossible to look at the facts of this case, and say that the effect of the agreement has not been to prefer particular creditors. Have not Eastman and Abbott received payment in full ? Have not McAlpin and other creditors received nothing ?

But then we have to encounter another objection. It is said there were no trusts here, secret or otherwise ; that the answers repudiate, expressly, such an idea. So they do, *in words,* and so they do the fact of insolvency ; a fact that was established with such a power and force of testimony, as to be absolutely overwhelming. But when we look a little closer to the facts sworn to, the trusts develope themselves.

But first, I call your attention to the fact, that the continued possession of the vendor, unexplained, does of itself raise the presumption of a secret trust for *him,* which is unrepelled, as we have shown ; and the same presumption that would make the deed void, under the statute of Elizabeth, would, with redoubled force apply to this statute, and make the deed void under it—there is a secret trust, and the law declares it for the vendor here.

And this is a trust in the property itself.

But again, there were actual trusts. It is not necessary that the trust should be in the estate sold. The trust may be in the proceeds of the sale. If a trust is created by the contract of sale, that will bring it within the act of 1818. Who is a trustee ?—2 *Story's Equity,* p. 374, sec. 1041, p. 379, sec. 1045, p. 544, sec. 1196.

Now let us apply this law. We say that there were several trusts here, and that Eastman, the vendee, was trustee.

1st. That out of the proceeds of purchase-money, he would pay off and deliver a note, so that Isaac W. Morrell, the accommodation endorser of S. Philbrick, the vendor, should be relieved.

2d. There was an express trust (it was part of the contract) for the benefit of Mrs. Abbott, a creditor of Philbrick ; the very foundation of the contract between Philbrick and Eastman was, that the debt of Mrs. Abbott against Philbrick should be paid out of the purchase-money.

3d. There was an express trust for the children of J. Stone, or for Eastman, the

vendee himself, (and I care not which it was,) for it was also agreed that this debt, due by Philbrick, should be paid out of the purchase-money.

And here we may ask, to whom was this debt due by Philbrick, upon the loan of the money of J. Stone's children? Who was the legal owner thereof? Either Eastman or the said children.

Eastman was the guardian. He says, in his answer, that " he loaned " Philbrick the money. It was due to him as guardian, to be sure, but still it was due to *him.* He was responsible to his wards, because the law required him to loan their money out only upon landed security. They had the equitable right, and he the legal.

But suppose this be not so, and that this was legally due to J. Stone's children; then Eastman was, by the agreement of purchase, made a trustee for them, to pay their favored debt, in exclusion of other creditors of Philbrick.

It seems to be perfectly immaterial *to* whom this debt was legally due. One thing is very certain, that it was a debt legally due by Philbrick; that it was an antecedent debt; that he was insolvent at the time of this agreement and conveyance; that by the very agreement itself, and certainly by its effect, this debt was paid in full, and other of his creditors were wholly excluded. And whether the agreement went to discharge a debt in full to Eastman himself, as one of the favored creditors, or went to relieve Eastman from his responsibility to his wards, on account of this note, or to relieve Morrell, the accommodation endorser of Philbrick, therefrom, or to pay the children of J. Stone this debt due to them, its extent, its object, and its effect, were to exclude certain creditors of an insolvent man, and to pay others, chosen by him, in full. And if this can be sanctioned by a court of law, despite the statute, then is the statute a mockery and a delusion—a legal trap to catch the consciences of failing men and greedy creditors!

An antecedent debt may be a good consideration in States which allow preferences, because the debt is the same as the money. It is not contrary to the policy; but in Georgia, under the act of 1818, the policy is different; preferences are forbidden. Any act done " by which " such preferences are given, are declared to be fraudulent. Receiving an antecedent debt as payment would be defeating the policy of the act of 1818.

But then, it is said, that this very act of 1818, provides that any person in debt, may *bona fide* and absolutely sell any part, or the whole, of his estate, so that the same be free from any trust for the benefit of the seller, or any person appointed by him.

Well, but what do the words *bona fide* mean? A transaction or sale made in conformity with, and not opposed to any law of force in the State.

This very act has just said, that a sale or transfer, by which any creditor of an insolvent man is excluded from his just debts, is contrary to the first principles of equity and justice, and therefore *not in good faith.*

It surely cannot mean, by these words, *bona fide*, to exempt a transfer or agreement made in the very teeth of this declaration, or to include a transfer whose intent and effect were to exclude certain creditors of an insolvent man, and to prefer certain other creditors, which it declares to be contrary to the first principles of equity and justice!

Though it may be a mark of good faith that money has been paid, yet all the money in the world will not constitute an act, done against any law, as an act done *bona fide.*

And besides, the statute says, that the sale spoken of in the proviso, must not only be done *bona fide*, but that the same must be free from any trust for the benefit of the seller, or any person or persons appointed by him. And that brings us back exactly where we started: for we allege, that the continued possession of vendor raises the legal presumption of a trust for him; and that there were trusts for the benefit of persons appointed by him, viz., Eastman, Morrell, Abbott, and J. Stone's children. And we have tried to show, and think we have shown, both by reason and authority, that whether these trusts are on the face of the deed of transfer, or are shown to exist by other proof; whether the deed be absolute or not, if its *effect*

be to create these benefits and illegal trusts, or if, to use the language of the statute, if the deed of transfer be one " by which any creditor is excluded," it is void.

But it is said Eastman purchased for a cash consideration, and that therefore any agreement as to the application of the money could not invalidate these transfers under the act of 1818.

Now, I admit, that though a man be insolvent, yet, that notwithstanding the statute of 1818, if there be no liens on his property, he may sell for cash or its equivalent (by which word I mean to exclude an antecedent debt) to any one ; so that there be no illegal agreement between the parties, so that there be no trust secret or otherwise, to bring it within the mischief and the remedy of the act of 1818: and this is the true meaning of the proviso in that statute which we have just been considering; and I admit, that if an insolvent man, without any pre-contract to that effect, or any agreement contrary to the spirit of the act of 1818, but after the sale shall have been *bona fide* made, and without any kind of trust, secret or otherwise, for the vendor or any other person, should direct the vendee to apply certain portions of that purchase-money to third persons, that so far as the *purchaser* was concerned, that this would be the same thing as if paid to vendor himself.

But this is the distinction that I draw, and it must be very obvious—and this is the distinction that the court below acted upon—viz : the act of 1818 allows even an insolvent man to sell his property, and receive the cash ; because the law presumes always that men will obey the law, and it cannot presume that they will violate it; and therefore, it presumes that the cash derived from this absolute and *bona fide* sale will be distributed ratably as the law directs.   But can this presumption arise, when, by the very contract of sale, it is expressly agreed that the purchase-money, or the larger portion of it, shall not be distributed ratably; but shall be applied to a few of the creditors, in exclusion of the others.—*Chancellor Kent's MS. Opinion.*

Eastman purchased, and Philbrick sold under an express agreement, the very inducement of the sale, that the purchase-money should not be paid to Philbrick, but should go to the payment of certain creditors in full, leaving the other creditors without a dollar.

Will the law allow two men to agree to produce an effect which it declares to be contrary to the first principles of equity and justice, and then allow the illegal act to stand, and the unjust bargain to be consummated under its very eyes, and with its aid and sanction ?

The distinction then is between a purchaser paying the purchase-money as his vendor directs, and without a previous agreement, and understanding to do what is contrary to law, and a purchaser agreeing with a vendor to buy, *provided* the purchase-money should be applied to a purpose and in a way that the law prohibited.   The Court would protect the first purchaser; but it would declare the act of the purchaser, secondly above named, as void, and leave him to reap the consequences of his illegal combination and confederacy.

Even if he had paid a full consideration, if he had paid it under an agreement contrary to law, under an agreement to do that which the law calls fraudulent, he stands in no fairer aspect in the eye of the courts than if he had not paid anything.—*Lowry* vs. *Pinson,* 2 *Bailey,* 324 ; *Thomas et al.* vs. *Jeter et al.,* 1 *Hill, S. C. Rep.* 380; *Ayres* vs. *Moore,* 2 *Stewart Alabama Rep.* 336—*cited in* 43 *Law Library,* notes to *Twyne's case,* p. 58.

It may be said that this was not a voluntary conveyance—that Eastman was pressing.

1st.  The first answer is, that Eastman did not press for these illegal conveyances ; he only pressed for the payment of these debts.   The offer of the sale of this property for these purposes came from Philbrick ; Eastman only accepted these offers.

2d.  Eastman, say the counsel opposed to us, was not a creditor of Philbrick ; they insist that the debt he represented as guardian of J. Stone's children, was due to them and not to *him.*   We believe it has never been decided, even under the

bankrupt laws of England, that if a third person, not a creditor, urges the debtor to pay a creditor, that *that* will exclude the preference from the operation of the law, or that it will cease to be voluntary.

3d. But is there any proviso in the act that, if the creditor asks or entreats, or even threatens the debtor, that because of that entreaty or threat, the debtor may perform an act that the statute declares to be contrary to the first principles of equity and justice? No power could have made the debtor execute the conveyance contrary to the law. Shall the entreaty or the threat legalize that which the law declares to be fraudulent and void? Shall the skillful, cunning, bold, unscrupulous creditor, because he asks or threatens a man to do that which the law forbids, be sustained and upheld by the law, and by its courts, because he has thus coaxed or threatened a violation of the statute? Or is not the meaning of the maxim, that the law was made for those who are vigilant and not for those who sleep, limited to those who by fair and legal methods obtain a priority, as by judgment and the like?

What have we to do with the bankrupt system of England? A man may be bankrupt there, though he has millions of pounds sterling above his indebtedness.

Ours is no bankrupt system, but it is an act passed to prevent an insolvent man from preferring one creditor to another.

The decision in 1 *Wash. C. C. Rep.* 34, says that the giving the preference would not constitute a bankruptcy, but that it would be a fraud upon the general creditors; that is what our statute says, and that is what we ask. We do not wish to declare Philbrick bankrupt under the English law.

When the court comes to examine this case, for the purpose of deciding it, let it ask—

1st. Was not Samuel Philbrick a person unable to pay his debts? Was he not utterly insolvent at the time of these transfers? This is conceded.

2d. Did he not make a transfer or assignment of all his estate?

3d. Were not the conveyances made to a person, or to persons, in satisfaction or payment of debts and demands, by which other creditors of the said debtor were excluded from an equal share of the property so assigned? Was not the effect of this agreement, and the transfer made in pursuance of it, to pay certain creditors of Philbrick, and to prevent McAlpin and other creditors from getting a cent?

It is impossible not to answer these questions in the affirmative, and it is perfectly clear, that both the spirit and letter of the act declare, that deeds made under such circumstances are void.

The last objection is, that the decree has not rendered justice to Eastman, even supposing these deeds to be void; because, having paid certain of Philbrick's debts, and having canceled and given up the evidences of these debts to Philbrick, he is equitably entitled to have his money refunded; and, at least, he is equitably entitled to be placed in the stead of these creditors, and to come in equally with the general creditors.

And the answer we make to this, is,

1st. No such instruction was asked of the court; no such argument was made to the jury; there was no error, therefore, with the court or jury; and this court has no cognizance of it.

2d. The argument is not founded in law. Give it its full effect, and it would amount to this: If a man combines with another, to effect an illegal act, and advances money for the purpose, if he is caught at it by the law, the contract is made void; but then, the money he paid is paid back to him by the law; so that if he succeeds in evading the law, he secures the fruits of his illegal act; but if he does not succeed, he loses nothing, since the law pays him back what he has paid, and he loses nothing.

This would be holding up an inducement to commit fraud, instead of hanging up a terror to prevent it.

Money paid upon an illegal contract, can never be recovered back; and East-

man could not recover from Philbrick this money, much less from the famished creditors of Philbrick.

He has received everything he is entitled to.

| | | |
|---|---:|---:|
| He agreed to give for the buildings, | $8,500 | 00 |
| Negroes, | 800 | 00 |
| Furniture, | 903 | 00 |
| | **$10,203** | **00** |

He paid this, as follows :

| | | | | |
|---|---:|---:|---:|---:|
| To the note due to J. Stone's children, | $4,621 | 00 | | |
| Abbott's estate, | 1,480 | 19 | | |
| Mortgage to Rogers, on Hicks Tything, | 1,070 | 01 | | |
| Do.    to Rogers, on Brown Ward, | 2,675 | 01 | | |
| Cash to Philbrick, | 356 | 79 | | |
| | | | 10,203 | 00 |

| | | |
|---|---:|---|
| He sold Hicks Tything for | $3,000 | |
| one negro for | 500 | |
| the furniture, valued at | 903 | |
| | $4,403 | |

The decree allowed him to retain this sum of $4,403, to recompense him for the legal mortgages paid to Rogers, amounting to $3,745 02
Cash paid to Philbrick,   356 79

$4,101 81

and besides this, the decree allowed him to have a lien for $3,000, on the lot and buildings in Brown Ward, to pay him for the repairs made on said buildings *since* his purchase.

This was allowing him more than the law allowed him; for the settled doctrine of the law is, that if a deed be made void by a statute, if it is void as to part, it is void as to whole.—1 *Saunder's Rep.* 66, *A*—Note 1 ; *Crossley* vs. *Arkwright*, 2 *D. and E.* 603 ; *Dunn* vs. *Dolman*, 5 *D. and E.* 641 ; *Rock* vs. *Thayer*, 13 *Wendell* 53; *Loomis* vs. *Newhall*, 15 *Pickering*, 167 ; 1 *Brock. Rep.* 184 ; *Crawford* vs. *Morrel*, 8 *John. Rep.* 198 ; *Goodrich* vs. *Downs*, 6 *Hill's N. Y. Rep.* 441 ; *Judge Johnson's Decision in Schultz* vs. *Bank of Georgia, MS.*

The jury dealt very liberally with him, therefore, in making him these allowances, which by law he was not entitled to.

3d. And our third answer is, that the decree has done him no injustice as to these debts he paid; nor, if he be a creditor, has it precluded him from claiming under it. It merely declares, that after the liens of the judgments are paid, all the creditors of Philbrick shall come in equally. If Eastman be a creditor, a point which the decree does not touch, he can come in under it, and take his equitable share.

Wm. LAW, in conclusion, for the plaintiffs in error.

1st. We say that the answers in regard to the possession remaining in the vendor, were responsive to the bill. The bill charges that the vendor continued in possession, and calls for an answer. It is answered by stating how that possession was continued.—*See* 1 *Cowen*, 742-4. The whole sentence must be taken together. Passages explanatory of what is responsive, must be read.—3 *Phil. Cow.* 927, *and cases.* Affirmative facts in answer, responsive to the bill, are conclusive, unless repelled.—2 *Phil. Cow. and cases.*

2d. Possession in vendor of land has not the same effect as chattels.—*New Con.* 371, *et seq.* ; *Robt. on Fraud, Con.* 549, 550-2-3.

3d. Possession no presumptive proof against positive testimony of actual pay-

Eastman et al. *vs.* McAlpin.

ment of cash consideration, establishing the *bona fides* of the transaction. It is a presumption of fraud, where anything is left to presumption, but cannot operate against opposing positive testimony.

4th. We say there was no trust of any kind which attached upon the property sold. What is a trust ?—*See* 2 *Story's Eq.* 230. Apply this definition to the case.

If there was any trust, it attached upon the purchase-money. But money is not embraced by the act. It is tangible property only.—*Ch. Harper's decision, page* 5. Under the act, the debtor may apply his money to the payment of his debts as he may prefer.

5th. My next proposition is, that by the proviso of the statute, an absolute sale for cash is saved.

6th. The purchase being made upon the condition that the money should be applied to the payment of certain debts, is not vitiated thereby.—*See* 5 *T. R.* 238 ; 4 *East ;* 1 *New.* 381-2. Upon this point, there is no reason to vary the construction upon our statute from the English. In the case in *Cowp.* it was the iniquitous intent to defeat a creditor. No such purpose appears here ; it was a commendable act.

But the decisive answer is, that as by our statute it was lawful for the vendor so to apply the money, it could not be rendered unlawful for the purchaser to agree to such application, and to make it the condition upon which he purchased.

7th. My next proposition is, that our statute does not inhibit the payment of a debt by an absolute transfer of property free from any trust or reservation. The debt is a good consideration ; and the statute is silent on the subject.—See proviso in the act. As to consideration, see *New.* 381 ; *Rob.* 434-6 ; 8 *T. R.* 528 ; 5 *T. R.* 238, 423. Why should not the same meaning be attached to the terms *bona fide* in our act?

We are answered by the argument that a preference may be given, which the statute meant to prevent. It is a common-law right, which authorizes a man to give this preference.—7 *Peters,* 614 ; 11 *Wheat.* 98. The statute does not in terms assail it. The argument is then preferred in support of the construction of our opponents, that being a remedial statute, and against fraud, it must be beneficially expounded.

But there is an opposing maxim, that statutes in derogation of common-law rights, must be strictly construed. Which shall prevail ? Both may be preserved. We will endeavor to harmonize their apparently conflicting operations.—*See Rob.* 13, 14, 15, 544.

Again, It is said the Legislature, in passing the act of 1818, must have intended to accomplish something more than was found in 13 *Eliz.*

We submit they have done so, by inhibiting assignments in trust for particular creditors ; whereby some advantage is gained to the debtor. And this last remark will explain the reason of the difference between what they have done and the inhibition of an absolute transfer. But if this were not so, the argument would not be sound. It is this—because the Legislature must have meant something which does not appear ; you will determine what they did mean. But all the States have legislated on this subject, notwithstanding the English statute was in force in most of them. Why this ?—*See Rob.* 10, *n.*

8th. My next proposition is, that if this view of the subject is not maintained, then the conveyance is void only when made by an *insolvent, voluntarily,* in *contemplation* of, and on the *eve* of *winding up,* and with the *intent* to give a fraudulent preference. Let us derive our reasoning here from the analogies of the law, and, 1st, from the bankrupt acts of England. Their great object was to secure equality in the distribution of a bankrupt's effects. So far the analogy is perfect. But they contemplated more, viz : that such distribution should be by law ; and that it should discharge the debtor from the debt. Now, by the construction of this act, a debtor might prefer a creditor. *Newl.* 381-2 ; *Doug.* 92 ; 7 *Peters,* 614. There must be a time when the right to transfer becomes illegal ; when the restraint upon the common-law right commences. Where will you fix it ? Because otherwise you invalidate every sale by a man in *debt,* who happens to fail afterwards. If

the rule we lay down is not the true one, by what other rule will you assign the limits? Can this case be brought within that rule?

*By the Court—*WARNER, Judge.

The complainant in this case filed his bill for the purpose of setting aside a conveyance of certain real and personal estate, made by Philbrick to Eastman, on the ground such conveyance was fraudulent, according to the provisions of the act of 19th Dec. 1818.

The complainant charges in his bill that Philbrick remained in possession of two of the negroes, and furniture after the sale, and occupied the house in Brown Ward, so soon as the same was sufficiently completed for that purpose. The complainant also charges, the property conveyed was held in *trust* for the benefit of the vendor, or persons appointed by him. The answers of the defendants admit the possession of Philbrick, but state, at the same time, he held such possession by rent and hire from Eastman, and the terms thereof. The answers positively deny all *trust* of any kind. On the trial of the cause in the Circuit Court, the presiding Judge charged the jury "that possession of the vendor, after the sale, was *prima facie* evidence of fraud; and unless explained, became conclusive: that the explanation of that possession, stated in the answers, was *no evidence,* because not responsive to the allegations, or interrogatories in the bill." We think the court below erred in its charge to the jury, in stating the explanation in the answers of the defendants was *no evidence,* because not responsive to the allegations or interrogatories in the bill. There is no doubt as to the rule, when the defendant in his answer, insists by way of *avoidance* on any *distinct fact,* he must by evidence prove such fact, in order to make it available in his defence. But here, the complainant charges one of the defendants in possession of the property conveyed, as being *prima facie* evidence of fraud. The defendants respond, and say, true, he is in possession of the property, but holds the possession as the tenant of the vendee, paying him rent and hire therefor; which rebuts the presumption of fraud. The defendants do not insist on any *distinct fact* by way of avoidance, but respond directly to the charge of being in possession, and explain *how the vendor is in possession.* The complainant contends, the defendants ought not to have the benefit of their explanation of the possession. Although he had interrogated them about it, they must tell *part* of the truth only; or, if they do tell the *whole truth* in answer to his question, *part* only shall be received: so much only will be received, as will fix *fraud* upon them; the explanation exculpating them must be rejected. We do not so understand the rule, as to exclude the explanation of the possession given by the defendants in this case; the answers are responsive to the charge, that the vendor remained in possession of the property, explaining the nature of that possession: and not insisting upon a *distinct fact,* by way of avoidance, with which they have not been charged or interrogated by the complainant. "The answer of the defendant is evidence for him, so far as it is responsive to the call in the bill for discovery, or connected necessarily with the responsive matter, or *explanatory* of it."—*Methodist Church of Cincinnati* vs. *Wood,* 5*th Hammond's Rep.* 284-5; *Davis* vs. *Sperling, Russel and Mylne,* 64; *Lady Ormond* vs. *Hutchinson,* 13*th*

*Vesey*, 53.   We are of opinion the defendant's answers ought to have been submitted to the jury for their consideration, and let them have determined what credit they were entitled to ; and that the court committed error, by entirely excluding that portion of them which explained the nature and character of the vendor's possession of the property conveyed. The next ground of error assigned, is the refusal of the court below to give the instructions prayed for by defendant's solicitor to the jury, that the conveyance of the property in question was not within the provisions of the act of 1818 ; but, on the contrary, the court did charge the conveyance by Philbrick to Eastman was within the provisions of that act. The act of 1818 affords a striking instance of inconsistent legislation, when we take into consideration the title of the act, the preamble thereto, and the enacting clause.   It is said by those who profess to have been acquainted with its legislative history, the enacting clause was amended after its introduction into the legislature, without the title and preamble to the act having been amended, so as to conform thereto. How this may have been, we cannot say, as we have no *judicial* evidence of the fact now before us.   We are to construe the act in accordance with established rules.   By the enacting clause of the act, it is declared, " That any person or persons, unable to pay his, her, or their debts, who shall, at any time hereafter, make any assignment or transfer of real or personal property, stock in trade, debts, dues or demands *in trust*, to any person or persons, in satisfaction or payment of any debt or demand, or in part thereof, for the use and benefit of his, her, or their creditor or creditors, or for the use and benefit of any other person or persons, by which any creditor of the said debtor shall or may be excluded from an equal share or portion of the estate so assigned or transferred, such assignment, transfer, deed, or conveyance, shall be void, and considered in law and equity as fraudulent against creditors.—*Provided, nevertheless*, that nothing contained in this act shall prevent any person or persons in debt from *bona fide* and absolutely selling, and disposing of any part, or the whole of his, her, or their estate, so the same *be free from any trust for the benefit of the seller, or any person or persons appointed by him, her, or them.*"

The true meaning of a statute is generally and properly to be sought from the body of the act itself.—1 *Kent's Com.* 461.   The great difficulty which has been felt in the minds of some in the construction of this statute, it is believed, has been in giving too much attention to the title and preamble, without carefully examining the enacting clause.   The title of the act and the preamble are, strictly speaking, no parts of it.   It is true they may assist in removing ambiguities where the intent is not plain, but where the words of the enacting clause are clear and positive, recourse must not be had to either of them.—1 *Kent's Com.* 460, 461. The *United States* vs. *Fisher*, 2 *Cranch Rep.* 358 ; *Crespigny* vs. *Wittenour*, 4th *Term Rep.* 793.   What conveyances does the enacting clause of the act declare shall be null and void, and fraudulent as against creditors ?   Such conveyances only as shall be made by persons unable to pay their debts, *in trust*, &c.   In order to make the conveyance void within the meaning of the statute, there must be a *trust* created for the benefit of the party making the conveyance, or for the benefit of some person appointed by him.   This is manifest from the proviso in the act.   In

order to remove all doubt as to the right of persons unable to pay their debts, to make a *bona fide* and absolute sale of their property, it is expressly declared : nothing contained in this act shall prevent any person or persons in debt, from *bona fide* and absolute selling and disposing of any part or the whole of his, her, or their estate, *so the same be free from any trust for the benefit of the seller, or any person appointed by him, her or them.* It was against assignments, transfers, and conveyances made by persons unable to pay their debts, *in trust for the benefit of the seller,* whether secret or otherwise, this statute was directed ; not against those who were unable to pay their debts, but who made an *absolute* and *bona fide* sale of their estate. Such, it is believed, has been the contemporaneous construction given to the statute by our courts ; there may have been some exceptions, it is true, but we speak of the general current of decisions. In June, 1834, the Judges of the Superior Courts held a convention at Milledgeville for the purpose of discussing and settling, so far as they could do, under our then imperfect system, such difficult and doubtful questions as the judges of their respective circuits might think proper to present. Judge Crawford, from the Northern circuit, presented this same question, growing out of the assignment made by Sims, Williams and Woolsey, of Augusta, to secure certain favorite creditors. All the judges of the State at that time were present, and concurred in the opinion (with one exception) that a debtor in failing circumstances could make an *absolute* and *bona fide* sale of his property to a creditor, provided there was no *trust* created for the benefit of the seller. The Legislature appear to have been satisfied with the construction given by the courts to this statute, inasmuch as no attempt has been made to control such construction by any legislative action. Indeed, we think such a construction is best adapted to the condition and habits of our people. If persons in debt were prohibited from making an absolute and *bona fide* sale of their property to a creditor or other person, it would oftentimes greatly embarrass, if not wholly ruin them. We are, therefore, of the opinion, a debtor in insolvent circumstances may make an absolute and *bona fide* sale of his property to a creditor in payment of a *bona fide* preexisting debt, or to any other person, without such sale being obnoxious to the provisions of the act of 1818, so there is no *trust* reserved for the benefit of the seller. It appears, from the record in this case, the sale from Philbrick to Eastman was absolute, and the purchase-money proved to have been paid by Eastman. There was no evidence of any trust reserved for the benefit of Philbrick, within the intent and meaning of the statute of 1818. It was insisted on the argument that the stipulation between Eastman and Philbrick, that the debt due Stone's children, and the debt due Mrs. Abbott, should be paid out of the purchase-money by Eastman, was evidence of a trust within the meaning of the act. These debts were admitted to be *bona fide,* and due the parties by Philbrick. Instead of paying the money into Philbrick's hands, for him to take up his notes due Stone's children and Mrs. Abbott, Eastman pays so much of the purchase-money as is requirnd to take up the notes, to the parties holding them, takes them up, and delivers them to Philbrick in payment of the property purchased. We see nothing in this arrangement affording the least evidence of a trust, or calculated to impeach the fairness of the transaction. We are, therefore, unanimously of the opinion the

court should have given to the jury the instructions prayed for by the defendant's solicitors, and that it committed error in refusing to do so, and in giving the contrary instruction. Let the judgment of the court below be reversed, and a new trial granted.